IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MEREDITH CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. _____ |
| ) | |
| theMAVEN, INC., ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT

Plaintiff Meredith Corporation ("Meredith"), through its counsel, alleges the following as its complaint for breach of contract against theMaven, Inc. ("Maven"):

## INTRODUCTION

1. This is a breach of contract action against Maven for failure to make payments for services rendered under two contracts with Meredith – an Outsourcing Agreement (the "OA") and a Transition Services Agreement (the "TSA") (collectively, the "Agreements") – both dated October 3, 2019. Under the Agreements, Meredith agreed to provide Maven with certain services (collectively, "Transition Services") necessary for Maven to publish *Sports Illustrated* and operate its related websites without interruption for a limited period of time (the "Transfer Period").

2. Notwithstanding Meredith's full performance of its obligations under the Agreements, written notices of nonpayment and breach, a contractual cure period (which Maven ignored), and several extensions of time and extensive negotiations, Maven has failed to pay the fees it owes for the Transition Services it indisputably received (the "Fees"). Accordingly, Meredith brings this lawsuit to enforce its rights under the Agreements.

## PARTIES

3. Plaintiff Meredith is an Iowa corporation having its principal place of business at 1716 Locust Street, Des Moines, IA 50309.

4. Defendant Maven is a Delaware corporation having its principal place of business at 1500 Fourth Avenue, Suite 200, Seattle, WA 98101.

## JURISDICTION

5. This Court has jurisdiction under 28 U.S.C. § 1332 because complete diversity exists and the amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.

6. Venue in this District is proper under 28 U.S.C. § 1391 because Defendant is a Delaware corporation and agreed by contract to venue and personal jurisdiction in this Court.

## BACKGROUND

7. First published on August 16, 1954 and continuously published since, *Sports Illustrated* has been called a "cultural touchstone" and a "national institution."[1] The covers of *Sports Illustrated* are considered "icons of popular culture."[2] For over six decades, *Sports Illustrated* has been known for its efficiency and consistency at publishing multiple issues a month.[3]

---

[1] Michael MacCambridge, *Who Can Explain the Athletic Heart*, THE RINGER (Apr. 11, 2018, 6:20 AM), https://www.theringer.com/2018/4/11/17220176/sports-illustrated-future-meredith-sale-history; Michael MacCambridge, The Franchise: A History of *Sports Illustrated* Magazine 8 (1998).

[2] *Id.*

[3] *See* MacCambridge, *Who Can Explain the Athletic Heart*, *supra* note 1.

8. In January 2018, Meredith completed its acquisition of Time Inc., the founder of *Sports Illustrated*.

9. On May 24, 2019, after publishing *Sports Illustrated* for a little over a year, Meredith entered into an Asset Purchase Agreement (the "Asset Purchase Agreement") with ABG-SI LLC ("ABG"), in which ABG agreed to purchase the assets and assume the liabilities of the business of *Sports Illustrated*, including the iconic print publication, its websites, associated publications, and intellectual property (collectively, the "Sports Illustrated Business").

10. Following the initial closing of the ABG acquisition, Meredith continued to operate portions of the Sports Illustrated Business on behalf of ABG, including publication of *Sports Illustrated*, pursuant to a license agreement.

11. To facilitate the transition of the business without interruption in publication, Meredith and ABG agreed to negotiate agreements for Meredith to provide Transition Services to ABG or to its designee to assist with operation of the Sports Illustrated Business once Meredith was no longer publishing *Sports Illustrated* on behalf of ABG. Asset Purchase Agreement, Article 5, Section 5.5(ii).

12. On June 14, 2019, ABG licensed to Maven the exclusive right to publish the print and digital editions of *Sports Illustrated*. ABG retained ownership of the Sports Illustrated Business, including the *Sports Illustrated* intellectual property, and continued to operate the business development, marketing, and licensing functions of the business. ABG asked Meredith to enter into the Agreements with Maven to facilitate the transition of those portions of the Sports Illustrated Business that would be operated by Maven.

13. Effective October 3, 2019, pursuant to the terms of the Asset Purchase Agreement and ABG's right to designate a service recipient, Meredith entered into the TSA with Maven,

whereby Meredith agreed to provide certain Transition Services necessary for the digital and print publications, including:

- Accounting & Brand Finance, including Collections for Accounts Receivable;
- Human Resources;
- Digital Sales Support/Programmatic Operations;
- Information Technology Services;
- Space Sharing;
- Website Support; and
- Data Integration/Analytics.

TSA, Article II, Section 2.01(a); *Id.* at Schedules A and C.

14. Also effective October 3, 2019, Meredith entered into the OA with Maven, whereby Meredith agreed to provide certain Transition Services related to the digital and print publications, including:

- Consumer Marketing;
- Print and Editorial Workflow Systems and Tools; and
- Magazine and Premedia Support Services.

OA, Article II, Section 2.01(a); *Id.* at Schedules A and C.

15. In exchange for Meredith's provision of the wide range of Transition Services, Maven agreed to pay the Fees for the services set forth in the Agreements, plus all third party costs attributed to Maven's use of each service, as outlined in Schedule C of the Agreements. TSA, Article III, Section 3.03(a); OA, Section Article III, Section 3.02(a).

16. To accommodate Maven in light of how quickly the payments would accrue once the Agreements became effective on October 3, 2019, Meredith agreed that that Maven would pay

"the amounts due for October 2019 no later than January 31, 2020, for November 2019 no later than February 29, 2020, and for December 2019 no later than March 31, 2020." TSA, Article III, Section 3.03(a); OA, Section Article III, Section 3.02(a).

17. The amounts owed for Transition Services provided after December 2019 would be due, in full, 30 days after receipt of the invoice. TSA, Article III, Section 3.03(a); OA, Section Article III, Section 3.02(a).

18. In addition to any other remedies for nonpayment, late payments would be subject to an interest charge of 10% per annum, accruing immediately and immediately due in addition to any late payments otherwise owed. TSA, Article III, Section 3.03(a); OA, Section Article III, Section 3.02(a).

19. Meredith had the right to apply any accounts receivable for the Sports Illustrated Business received by Meredith for issues published by Maven during the Transfer Period against any payments due for Transition Services that were not received by Meredith on or before the date such amount was due. Specifically, the Agreements provided an off-set right to Meredith, applicable to payments made to Meredith for Maven's account, whereby Meredith "may apply any receipts due to [Maven] to any payment due hereunder that is not received by [Meredith] on or before the date such amount is due." TSA, Article III, Section 3.03(b); OA, Section Article III, Section 3.02(b).

20. Notwithstanding the extended schedule afforded to Maven to pay its obligations to Meredith, Maven failed to pay *any* of the invoices Meredith issued (the "Invoices") on the due dates established by the Agreements.

21. Although Maven had the right to "dispute any portion of an invoice delivered … by written notice to Meredith within 10 days following receipt of such invoice," OA, Article III,

Section 3.02(a); TSA, Article III, Section 3.03(a), Maven did not dispute any portion of any of the Invoices within the prescribed contractual period.

22. On March 30, 2020, Meredith informed Maven that, despite Meredith's application of certain accounts receivable due to Maven to its outstanding balance, Maven was still in arrears; that on March 31, 2020, Maven's debt would increase as its December 2019 Invoice became due; and that on April 4, 2020, when Maven's latest Invoice would become due, Maven would still have a past due balance of $3.9 million. The March 30, 2020 communication also reminded Maven of the agreed-upon late interest charge of 10% per annum and included as an attachment a highly detailed accounting of the amounts Maven owed in aggregate under the Agreements, including all the Invoices.

23. Maven neither provided written notice to Meredith that Maven disputed the Invoices nor disputed Meredith's right to apply the accounts receivable to Maven's balance. TSA, Article VIII, Section 8.01; OA, Section Article VIII, Section 8.01.

24. On April 9, 2020, Meredith provided written notice to Maven, in accordance with the requirements for such notice under Section 8.01 of the Agreements, that Maven was in breach of the Agreements for nonpayment due to its failure to pay for $3.9 million in Transition Services ("Notice of Breach"). The Notice of Breach is attached as Exhibit A.

25. By the date of the Notice of Breach, other than the amounts off-set by Maven accounts receivable received by Meredith, Maven had failed to pay for Transition Services for October 2019, November 2019, December 2019, January 2020, and February 2020. The Notice of Breach included the previously-sent accounting statement Maven received on March 30, 2020.

26. Under the Agreements, Maven had ten business days to cure its nonpayment after receipt of the Notice of Breach. TSA, Article VII, Section 7.01; OA, Article VII, Section 7.01.

27. On April 23, 2020, the cure period ended without Maven making any payment or even responding to the Notice of Breach.

28. Maven's complete failure to make payment (or to cure its nonpayment) was a material breach of the Agreements. Accordingly, on April 27, 2020, Meredith provided written notice to Maven, in accordance with the requirements for such notice under Section 4.02(b) of the Agreements, that Meredith was exercising its rights under Article IV, Section 4.02(b) to terminate the Agreements in 30 days, effective May 27, 2020 ("Notice of Termination"). The Notice of Termination is attached as Exhibit B. The Notice of Termination notified Maven that it was still liable for its outstanding balance, as well as for any further payment obligations that might accrue.

29. Maven did not respond to the Notice of Breach until a letter sent on or about May 5, 2020 – almost two weeks after the cure period under the Agreements had ended and more than a week after Maven's receipt of the Notice of Termination. Maven's response, which belatedly attempts to dispute the Invoices, is untimely and invalid under the plain terms of the Agreements.

30. Notwithstanding Maven's failure to comply with the terms of the Agreements, Meredith spent months attempting to work with Maven in good faith to arrange for payment of its outstanding obligations, and Meredith even agreed to extend the termination date to accommodate Maven. Instead of paying its full obligations or agreeing to a payment plan, Maven stalled and has refused to make full and timely payment as required. During this time, though a portion of Maven's payments were off-set by Maven accounts receivable received by Meredith (and off-set pursuant to the terms of the Agreements), Maven maintained an outstanding balance due to Meredith despite continuing to receive the Transition Services.

31. As of the date of this filing, Maven still owes Meredith $1,087,065. As a result of Maven's failure to pay its outstanding balance, on July 14, 2020, Meredith terminated the

Agreements, including all services it was then providing to Maven. This action follows, seeking payment for Maven's outstanding balance.

## CAUSES OF ACTION

### COUNT I – Breach of Contract (Outsourcing Agreement)

32. The allegations contained in the foregoing paragraphs are realleged and incorporated herein by reference.

33. The OA is a valid and binding agreement between Plaintiff and Defendant.

34. Defendant was obligated to pay to Plaintiff "the [Fees] due for October 2019 no later than January 31, 2020, for November 2019 no later than February 29, 2020, and for December 2019 no later than March 31, 2020," and other Invoices due thirty days from their receipt by Maven, per Article III, Section 3.02(a).

35. Defendant failed to pay the Invoices that became due.

36. Defendant did not exercise its right under the OA to dispute the Invoices within ten days of receipt, the period set forth by Article III, Section 3.02(a).

37. In a letter dated April 9, 2020, Plaintiff provided Defendant with written Notice of Breach notifying Maven that it had materially breached the OA by failing to make payments under the OA for the Invoices due January 31, 2020, February 29, 2020, March 31, 2020, and April 4, 2020.

38. Defendant failed to cure its material breach within ten business days of the Notice of Breach, the cure period set forth by Article VII, Section 7.01 of the OA.

39. As of August 4, 2020, Defendant maintains an unpaid balance for the services Plaintiff provided under the OA, including Fees that have accrued since Plaintiff's Notice of Breach dated April 9, 2020.

40. Plaintiff has fully performed its obligations under the OA.

41. Pursuant to Article III, Section 3.02(a) and Article IV, Section 4.02(e) of the OA, notwithstanding termination, Plaintiff is entitled to the full balance currently outstanding as well as a late payment interest charge of 10% per annum.

**COUNT II – Breach of Contract (Transition Services Agreement)**

42. The allegations contained in paragraphs 1 through 31 are realleged and incorporated herein by reference.

43. The TSA is a valid and binding agreement between Plaintiff and Defendant.

44. Defendant was obligated to pay to Plaintiff "the [Fees] due for October 2019 no later than January 31, 2020, for November 2019 no later than February 29, 2020, and for December 2019 no later than March 31, 2020," and other Invoices due thirty days from their receipt by Maven, as per Article III, Section 3.03(a).

45. Defendant failed to pay the Invoices that became due.

46. Defendant did not exercise its right under the TSA to dispute the Invoices within ten days of receipt, the period set forth by Article III, Section 3.03(a).

47. In a letter dated April 9, 2020, Plaintiff provided Defendant with written Notice of Breach notifying Maven that it had materially breached the TSA by failing to make payments under the TSA for the Invoices due January 31, 2020, February 29, 2020, March 31, 2020, and April 4, 2020.

48. Defendant failed to cure its material breach within ten business days of the Notice of Breach, the cure period set forth by Article VII, Section 7.01 of the TSA.

49. As of August 4, 2020, Defendant maintains an unpaid balance for the services Plaintiff provided under the TSA, including Fees that have accrued since Plaintiff's Notice of Breach dated April 9, 2020.

50. Plaintiff has fully performed its obligations under the TSA.

51. Pursuant to Article III, Section 3.03(a) and Article IV, Section 4.02(d) of the TSA, notwithstanding termination, Plaintiff is entitled to the full balance currently outstanding as well as a late payment interest charge of 10% per annum.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment against Defendant as follows:

a. A judgment that Defendant is in material breach of the Outsourcing Agreement and the Transition Services Agreement;

b. An award of damages against Defendant in the amount of $1,087,065, along with a late payment interest charge of 10% per annum accruing from the due date of each Invoice until paid in full;

c. An award of pre- and post-judgment interest, attorneys' fees, and other costs and disbursements associated with this action, as permitted by law; and

d. Such further and other relief as the Court may deem just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:

David E. Mills
Sean N. Johnson
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004-2400
(202) 842-7800
dmills@cooley.com
sjohnson@cooley.com

*/s/ Ryan D. Stottmann*
William M. Lafferty (#2755)
Ryan D. Stottmann (#5237)
Sabrina M. Hendershot (#6286)
1201 N. Market Street
Wilmington, DE 19801
(302) 658-9200
wlafferty@mnat.com
rstottmann@mnat.com
shendershot@mnat.com

*Attorneys for Plaintiff Meredith Corporation*

August 17, 2020